IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PHILIP J. GADZINSKI,

                Plaintiff,

v.                                                           OPINION and ORDER

DOUG BELLILE, MITCH LENSKI, and                19-cv-339-jdp
ALICIA BOEHME,

                Defendants.

---

Pro se plaintiff Philip J. Gadzinski challenges the video game restrictions at Sand Ridge Secure Treatment Center, where he is confined as a sexually violent person. Gadzinski contends that defendants violated his First Amendment rights by denying him access to a video game system that he attempted to purchase, and then retaliated against him for advocating a change in the video game policy.

Defendants move for summary judgment on both of Gadzinski's claims. For reasons explained in this opinion, I conclude that defendants' video game policy does not violate the First Amendment, and that Gadzinski was disciplined, not for advocating for a policy change, but for violating the rules against contraband. I will grant defendants' motion and dismiss the case.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Gadzinski is civilly committed at Sand Ridge as a sexually violent person under Wisconsin Statutes Chapter 980. Sand Ridge is a Wisconsin Department of Health Services (DHS) institution that houses sexually violent persons. Its mission is to provide its patients

with treatment that reduces the likelihood of recidivism and future sexual offenses. Sand Ridge patients are in custody for "control, care and treatment until such time as the person is no longer a sexually violent person." Wis. Stat. § 980.06.

The defendants are Sand Ridge Director Doug Bellile, Sand Ridge Investigations Captain Mitch Lenski, and Supervised Release Section Chief Alicia Boehme, who works at the DHS Division of Care and Treatment Services.

Sand Ridge has restricted personal video games and video game systems since 2005. When the policy was first announced, patients could no longer bring new games or systems into the institution, but previously purchased games and systems were grandfathered in. Dkt. 32-1. Sand Ridge's 2005 policy was based on concerns that video games were interfering with treatment, rehabilitation, and security at the facility. Sex offenders had used video games to groom victims, rating systems were inadequate to determine the content of games, patients became addicted to games and could not stay awake during treatment, and some patients traded access to video games for sexual favors. *Id.*

Sand Ridge revised its video game policy in 2017. Dkt. 32-3. The current version gives Sand Ridge the authority to restrict and confiscate grandfathered-in games and systems, if they are deemed counter-therapeutic to a particular patient because of a game's content or because of overuse by a patient. Dkt. 32-3. Although patients are now mostly barred from personal game ownership, they have "structured" access to approved exercise, social, and educational video games on an Xbox 360 Kinect. Patients can sign up to play these games for limited time periods through the Therapeutic Recreational Department.

Gadzinski has been a patient at Sand Ridge since 2009. In January 2019, he sent defendants Bellile and Lenksi a proposed amended policy that would allow patients to own

video game systems with preloaded games. Dkt. 32-4. Bellile rejected Gadzinski's proposal. Despite Bellile's response, Gadzinski ordered a PlayStation Classic, which is a video game console preloaded with 20 games. The Entertainment Software Rating Board has rated ten of those games as violent, and most of those have been flagged for blood and gore, suggestive themes, drugs and alcohol, nudity, or sexual themes and content.[1] Before ordering the PlayStation Classic, Gadzinski told Sand Ridge staff that he knew he would not be permitted to keep it, but that he needed to order it to lay the groundwork for a lawsuit.

When Gadzinski's PlayStation Classic arrived at Sand Ridge, he was not allowed to pick it up and the package was returned to the vendor. Lenksi then issued two disciplinary actions against Gadzinski: (1) a Behavior Disposition Record (BDR), which is used to impose sanctions when a patient violates a disciplinary rule; and (2) a Client Rights Limitation or Denial Documentation (CRLDD), which is used to limit rights or privileges when a patient's conduct creates a security or treatment concern. As a result of these disciplinary actions, Gadzinski lost certain privileges for about a month. Neither disciplinary action was mandatory; Gadzinski had previously ordered prohibited items without consequences.

Gadzinski filed a grievance with the Sand Ridge Client Rights Office. He asked that the institution lift the video game prohibition, allow him to have a PlayStation Classic, and revoke his CRLDD. A client rights facilitator denied the grievance and concluded that Gadzinski's rights had not been violated. Defendant Boehme was interviewed as part of the investigation and provided general information about video game restrictions for patients once they are released from Sand Ridge and placed on supervised release.

---

[1] "Search ESRB Game Ratings," https://www.esrb.org/, accessed February 9, 2021.

ANALYSIS

Gadzinski brings two First Amendment claims: (1) Sand Ridge's video game restriction violates his right to free speech; and (2) Lenski retaliated against him for advocating for more access to video games. Defendants move for summary judgment on both claims.

## A. First Amendment video game claim

Video games are protected as expression under the First Amendment, just as are books, movies, and other media. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011). But an inmates' right to receive and consume these expressive materials is limited. *Thornburgh v. Abbott*, 490 U.S. 401 (1989). Prisons may restrict access to expressive materials if the limitation is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78 (1987). The *Turner* standard also applies to restrictions placed on civilly committed detainees. *Brown v. Phillips*, 801 F.3d 849, 853 (7th Cir. 2015). So the question here is whether Sand Ridge's video game policy is reasonably related to legitimate penological interests.

*Turner* requires the court to consider four factors in determining whether a restriction is reasonably related to legitimate penological interests: (1) the existence of a "valid, rational connection" between the restriction and a legitimate, neutral government interest; (2) the existence of alternative methods for the detainee to exercise his constitutional right; (3) the effect the detainee's assertion of that right will have on the operation of the facility; and (4) whether there is an obvious, easy alternative method to satisfy the government's legitimate interest. *Turner*, 482 U.S. at 89–91. In the context of civil detainees, I must recognize that "persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Brown v. Phillips*, 801 F.3d at 853 (quoting *Youngberg v. Romeo*, 457 U.S. 307,

321–22 (1982)). Gadzinski bears the ultimate burden of proving the invalidity of the Sand Ridge video game policy. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

### 1. Connection between the policy and legitimate penological objectives

The first *Turner* factor is often decisive: whether there is a "valid, rational connection" between the restriction and a legitimate, neutral government interest. *Singer v. Raemisch*, 593 F.3d 529, 536–37 (7th Cir. 2010). The initial burden rests on the defendants to offer a plausible explanation for the speech restriction. *Id.* This requires more than defendants' assertion of a formalistic logical connection; defendants must present at least some evidence to justify the restriction. *Brown v. Phillips*, 801 F.3d at 853–54. If the defendants make their initial showing, the burden then shifts to plaintiff to present evidence undermining the defendants' explanation. *Singer*, 593 F.3d at 536–37.

Challenges to video game restrictions at Sand Ridge and other institutions for sexually violent persons are familiar to courts in the Seventh Circuit. This court has already upheld Sand Ridge's 2005 video game policy as rationally connected to the facility's treatment interests. *Hedgespeth v. Bartow*, No. 09-cv-246-slc, 2010 WL 2990897, at *1 (W.D. Wis. July 27, 2010). Sand Ridge instituted the ban because some sex offenders use video games, video game stores, and arcades to meet and groom victims. *Id.* at *5. Staff had concerns about the messages that video game content could send about violence, fraud, sex, women, and children, and some patients were using video games to the point of obsession, addiction, and self-isolation. *Id.* This court concluded that Sand Ridge had an interest in promoting rehabilitation and a therapeutic environment by preventing patients from playing video games that could encourage anti-social and obsessive behavior. *Id.* at *7.

About five years after *Hedgespeth*, the U.S. Court of Appeals for the Seventh Circuit upheld a ban on internet-connected video games at an Illinois sexually violent treatment center. *Brown v. Phillips*, 801 F.3d at 855. But the court vacated judgment as it related to the treatment center's ban on R-rated movies and M-rated (for "mature") video games because the defendants relied exclusively on their bare, unsupported assertion that sexually explicit material was counter-therapeutic. *Id.* at 854–55. In contrast, the court accepted defendants' argument in support of the internet-enabled video game console ban: allowing detainees to own devices through which they could contact victims and access illegal pornography was rationally connected to protecting the public and preventing crime. *Id.* at 855.

*Brown v. Phillips* made clear that, when challenged, civil detention facilities must support their media content restrictions with at least some evidence. But courts continue to recognize institutions' broad authority to define what media consumption policies are necessary to meet their treatment and security needs. *See, e.g. Maher v. Bellile*, No. 18-cv-1061-bbc, 2020 WL 6581349, at *1 (W.D. Wis. Nov. 10, 2020) (concluding that Sand Ridge's broad policy of restricting patients' access to certain movies, books, music, magazines, and photographs had a valid, rational connection to rehabilitation interests); *Bailey v. Stover*, 766 F. App'x 399, 400 (7th Cir. 2019), *reh'g denied* (May 10, 2019) (determining that an Illinois facility for sexually violent persons' ban on sexually stimulating media materials was rationally connected to rehabilitation interests).

Defendants in this case contend that Sand Ridge's policy is justified for two primary reasons: violent and sexually explicit video games may be counter-therapeutic, and video games may lead to addiction-like gaming disorders. Defendants adduce the declaration of Sand Ridge Treatment Director Jason Smith, who cites several studies supporting the finding that certain

6

video games can be psychologically harmful and increase aggression. Dkt. 27. Smith cites a 2010 meta-review of 136 prior studies involving more than 130,296 participants, whose lead author is Craig A. Anderson. Dkt. 27-1. Smith also cites a 2018 study by Anderson and Johnnie J. Allen on video gaming disorders. Dkt. 27-3.

I am not ready to endorse Anderson's more recent research without a more searching inquiry. But defendants have clearly met the requirements of *Brown v. Phillips*, which is that they have some evidence to support their video game policy. The policy also has the common-sense appeal that the treatment of patients civilly committed as sexually violent persons would not be facilitated if the patients were allowed to play violent video games of their choice. To be sure, common sense alone might not be enough to sustain defendants' burden under *Brown v. Phillips*, but common-sense appeal supported by evidence makes for a strong showing.

As Gadzinski points out, Anderson's conclusions and research methods have been criticized in First Amendment video game cases. Dkt. 34, at 4–5. *See, e.g., Entm't Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1059-64, 1072 (N.D. Ill. 2005), *aff'd*, 469 F.3d 641 (7th Cir. 2006) (concluding that Anderson's research failed to show a causal link between violent video games and more aggressive feelings or behaviors among youth); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578 (7th Cir. 2001) (determining that Anderson's studies "do not find that video games have ever caused anyone to commit a violent act, as opposed to feeling aggressive, or have caused the average level of violence to increase anywhere.") But none of these cases address the 2010 meta-study or the 2018 video gaming disorder article that defendants rely on here.

Defendants also cite other reasons for the video game restrictions that do not depend on social science research. Sand Ridge Director Bellile offered declaration testimony that games

7

and game systems lead to obsessive and anti-social behaviors. Dkt. 32, at ¶¶ 10–16. For example, he says that consistent use of video games fosters self-isolation and reduces community involvement. He also states that some patients have become addicted to video games, causing them to decline meals and prescription medications, which can lead to disruptive situations in which staff or patients can be injured. Smith testifies that patients with video game addictions can be too tired to stay alert in treatment groups. Dkt. 27, at ¶ 30.

Defendants also cite security concerns. Bellile says that lifting the policy would tax facility resources because staff would need to search all incoming games and systems for contraband. Dkt. 32, at ¶¶ 10–16. Video games can be dubbed over with disallowed content, a problem that Sand Ridge has encountered with other media forms. Staff have also found drugs or weapons hidden inside electronics that patients have received at the facility. Finally, Bellile says that because many sex offenders use video games to meet and groom victims, most Sand Ridge patients are not permitted to own video games once they are placed on supervised release and should not be allowed to have them at the facility either.

Defendants offer reasonable explanations, supported by appropriate evidence for restricting video games. Gadzinski's criticism of Anderson's earlier research does not meaningfully refute defendants' justifications. I will generally defer to treatment center officials on disputed matters of professional judgment, including whether video games are counter-therapeutic and detrimental to offenders' treatment. *Maher*, 2020 WL 6581349 at *5; *Thielman v. Leean*, 282 F.3d 478, 483 (7th Cir. 2002) ("facilities dealing with those who have been involuntarily committed for sexual disorders are 'volatile' environments whose day-to-day operations cannot be managed from on high").

Defendants have met their burden on the first *Turner* factor.

8

### 2. Gadzinski's alternative means of exercising his constitutional rights

Gadzinski has an alternative means of accessing video games. Sand Ridge patients may sign up to play 18 exercise, prosocial, and educational Xbox 360 Kinect video games, on a structured and scheduled basis. Gadzinski contends that not all patients are able to play the games because of age or physical disability, but he does not present evidence that he, or any other patient, cannot play the Xbox games if they want to.

The Sand Ridge restrictions prevent patients from accessing counter-therapeutic games and limits the amount of time patients can play games to prevent compulsive behavior. The restrictions are appropriately directed to the deleterious effects of video games without eliminating them entirely.

The second factor also favors defendants.

### 3. Alternatives to the blanket ban on new video games

I'll address the third and fourth factors together, as both factors ask, essentially, how Sand Ridge would deal with changes to its blanket ban on new video games and systems.

Defendants explain that a flexible, case-by-case policy would require unworkable additional efforts to review video games. As Smith explained in his declaration, if the blanket video game ban were lifted, staff would have to conduct a game-by-game, patient-by-patient review each time a patient requested a video game or game system. He also says that "a whole new level of monitoring would be necessary to ensure patients were behaving responsibly with video games." Dkt. 27, at ¶ 32. And, as noted above, Sand Ridge would have to search all incoming devices and video games for contraband items and content.

Gadzinski says that allowing video games would involve no more than modifying policy documents and property lists. Gadzinski points out that Lenski concedes that reviewing a small

9

number of video games for one patient would not drain Sand Ridge resources. Dkt. 37-8, at ¶ 17–18. But Lenski also said that conducting content reviews for an influx of patients who requested video games would be overburdensome. *Id.*

All four *Turner* factors favor defendants. I conclude that Sand Ridge's video game prohibition is rationally related to the institution's legitimate penological interests in security, treatment, and rehabilitation of patients. Because I have decided Gadzinski's First Amendment claim against him on the merits, I need not address whether defendant Boehme was personally involved in the deprivation of his rights, or whether defendants are entitled to qualified immunity.

**B. First Amendment retaliation claim**

Lenski issued Gadzinski two disciplinary actions after he ordered the PlayStation Classic. Gadzinski received a BDR resulting in the loss of several privileges for one month, including a later room curfew, no in-room visits with other patients, and permission to order food delivery one evening a week from an outside restaurant. Gadzinski also received a CRLDD, which limited his right to order property from outside vendors without prior approval for one month. Gadzinski contends that these disciplinary actions were really in retaliation for his advocacy of changes to the video game policy.

To prevail on his First Amendment retaliation claim, Gadzinski must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was a "motivating factor" in the defendant's decision to take the actions that the resulted in the deprivation. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If plaintiff makes this

10

showing, the burden shifts to defendants to show that they would have taken the same action even without the retaliatory motive. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996).

Defendants concede that Gadzinski's video game advocacy was protected by the First Amendment. *See Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) (First Amendment protects prisoner's complaints about issues affecting all prisoners and designed to effect a change in prison policy).

Gadzinski lost privileges for a short period. This is not a particularly severe sanction, but for purposes of defendants' motion, I'll assume that the disciplinary actions would be enough to deter a patient from exercising his First Amendment rights.

Gadzinski falters on the third element. "A plaintiff who has evidence that officials were motivated to discipline the prisoner because of protected speech cannot prevail if the officials show, without contradiction, that they would have disciplined him anyway for a legitimate reason." *Harris v. Walls*, 604 F. App'x 518, 521–22 (7th Cir. 2015) (citing *Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011)). In *Harris*, prison officials disciplined plaintiff for coaching other inmates to file false grievances for a lawsuit he was planning. *Id.* The court concluded that his retaliation claim failed: even if defendants resented and disapproved of plaintiff's First Amendment activity, they genuinely and undisputedly believed that he violated prison rules and they punished him for legitimate reasons. *Id.*

Lenski says that he disciplined Gadzinski because Gadzinski did not follow directions and violated Sand Ridge rules; he ordered contraband that he was specifically told he could not have. Dkt. 33, at ¶ 11, 22. Gadzinski concedes that he violated the rules as charged. But he argues that he had ordered prohibited property to Sand Ridge before and faced no disciplinary consequences. So, his argument goes, the only reason Lenski punished him this time was

11

because of his planned litigation. But Gadzinski does not say anything about the other times he ordered banned property, so I cannot tell whether the differential treatment was caused by any retaliatory motive.

Gadzinski also relies on email among Sand Ridge staff to suggest that the discipline was retaliatory. Gadzinski told many staff members about his planned lawsuit and that he believed that he needed to attempt to purchase—and be denied—a video game system as a prerequisite to a lawsuit. Dkt. 37, at ¶ 8. In response, Lenski, Bellile and Smith, discussed their plan to impose discipline if Gadzinski intentionally broke the rules and ordered a contraband video game system. Dkt. 37-1. This shows that defendants knew that Gadzinski intended to order a contraband gaming system, and that they planned in advance to issue discipline if Gadzinski followed through with his plan. This is, at best, meager evidence of retaliatory motive.

But its undisputed that Lenski issued the BDR and CRLDD only after Gadzinski ordered contraband that he knew he was not allowed to have. Lenski had a legitimate reason for issuing the disciplinary actions, and the sanctions were relatively minor ones. No reasonable jury could conclude on this record that Lenski retaliated against Gadzinski for his planned lawsuit, nor could a reasonable jury conclude that Lenski would not have imposed the discipline if not for a retaliatory motive.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 39, is GRANTED.

2. The clerk of court is directed to enter judgment for defendants and close this case.

Entered February 17, 2021.

                                        BY THE COURT:

                                        /s/

                                        _____

                                        JAMES D. PETERSON
                                        District Judge